# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JAMES BUTLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 10-cv-6652 |
| | ) |
| EAST LAKE MANAGEMENT GROUP, INC. | ) Judge Robert M. Dow, Jr. |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Butler has filed numerous *pro se* complaints against his former employer, Defendant East Lake Management Group, Inc., under federal and state law. The current version of the complaint alleges violations of the Family Medical Leave Act ("FMLA") (Count III) and retaliatory discharge (Count IV). Before the Court is Defendant East Lake Management Group, Inc.'s motion for summary judgment [87] on Counts III and IV of Plaintiff's fourth amended complaint.[1] For the reasons stated below, the Court grants Defendant's motion for summary judgment [87] and will enter judgment in favor of Defendant and against Plaintiff.

## I.    Background

### A.    Procedural Background

Plaintiff James Butler worked as a janitor at Princeton Apartments, a Chicago Housing Authority property that was managed by Defendant East Lake Management Group, Inc., for more than six years. He was laid off in October 2009. On November 2, 2010, Plaintiff filed his original complaint against Defendant. After Plaintiff filed an amended complaint, the Court recruited counsel to assist Plaintiff. Not long after counsel filed a second amended complaint, Plaintiff dismissed his lawyer [see 38, 40] and sought leave to file a third amended complaint,

---

[1] The Court previously granted Defendant's motion to dismiss Counts I (ADA) and II (FLSA).

1

which the Court granted. On November 1, 2011, Plaintiff filed his third amended complaint, which asserted five counts for relief. Defendant moved to dismiss Plaintiff's third amended complaint, which the Court granted in part and denied in part [see 59]. The Court dismissed Count I (gender discrimination) with prejudice and Counts II (Americans with Disabilities Act (ADA)) and IV (Fair Labor Standards Act (FLSA)) without prejudice. In its opinion, the Court set forth both the legal standard governing a motion to dismiss and what a plaintiff must plead to sufficiently allege both ADA and FLSA violations. Given Plaintiff's *pro se* status, the Court gave Plaintiff 21 days in which to file a motion for leave to file an amended complaint if he felt that he could cure any of the deficiencies identified by the Court in dismissing Counts II and IV.

Plaintiff filed a fourth amended complaint [66], asserting four counts: Count I (ADA), Count II (FLSA), Count III (Family Medical Leave Act (FMLA)), and Count IV (Retaliatory Discharge). Defendant filed an answer and affirmative defenses in response to Counts III and IV and once again moved to dismiss Counts I and II for failure to state a claim. The Court granted Defendant's motion to dismiss [69] and dismissed Counts I and II with prejudice. The case has proceeded to summary judgment on Counts III and IV.

In Count IV (Retaliatory Discharge), Plaintiff alleges that, on October 9, he gave his supervisor a doctor's note and told her that he needed surgery. On October 12, his supervisor came to his apartment and told Plaintiff to "fuck [his] worker's compensation" before handing Plaintiff a layoff notice. He alleges that the discharge was "under the pretext of layoff to deny [him] a chance to file a [worker's compensation] claim." In Count III (FMLA), Plaintiff alleges that he was eligible for FMLA leave and that Defendant was obliged to provide him with FMLA leave. He repeats his allegation about giving his supervisor the doctor's note and receiving a layoff notice. Plaintiff concludes that Defendant "interfered with my protected rights under

2

FMLA with the pretext of layoffs to prevent me from taking family medical leave."

B. The Parties' Fact Statements

It is the function of the Court to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement. See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004). Because Butler dismissed recruited counsel and thus is *pro se* at this stage of the case, Defendant served him with a requisite notice under Local Rule 56.2, which explained the requirements of Local Rule 56.1 and warned Plaintiff that his failure to properly rebut the facts in Defendant's Local Rule 56.1 statement would result in those facts being deemed admitted. Although *pro se* plaintiffs are entitled to a generous reading of their submissions, compliance with procedural rules is required. See *Cady v. Sheahan,* 467 F.3d 1057, 1061 (7th Cir. 2006) ("even *pro se* litigants must follow rules of civil procedure"). Thus, Butler's status as a *pro se* litigant does not excuse him from complying with Local Rule 56.1. See *McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel"); *Coleman v. Goodwill Indus. of Se. Wis., Inc.,* 423 Fed. App'x 642, 643 (7th Cir. 2011) ("Though courts are solicitous of *pro se* litigants, they may nonetheless require strict compliance with local rules."); *Wilson v. Kautex, Inc.,* 371 Fed. App'x 663, 664 (7th Cir. 2010) ("strictly enforcing Local Rule 56.1 was well within the district court's discretion," even though the plaintiff was *pro se*) (citations omitted).

Many of Plaintiff's responses fail to properly rebut the facts in Defendant's Local Rule 56.1 statement. Plaintiff's LR 56.1 response admits some facts as set forth by Defendant, and therefore those facts are deemed admitted for purposes of the summary judgment motion. However, for a number of fact statements, Plaintiff objections to the fact, but does so in a confusing manner and without citing to any relevant evidence to actually refute Defendant's factual submission. Such denials are not sufficient to defeat summary judgment; rather, a nonmovant must support each denial with relevant materials or affidavits that support their denial. See, *e.g., Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527-29 (7th Cir. 2000) (affirming summary judgment when district judge struck plaintiff's entire LR 12 (now LR 56.1) statement); *McGuire v. UPS*, 152 F.3d 673, 675 (7th Cir. 1998) ("An answer that does not deny the allegations in the numbered paragraphs with citations to supporting evidence in the record constitutes an admission.") (internal citations omitted); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("[A] general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial."). Although Plaintiff's responses contained citations to various exhibits, much of the evidence cited was not relevant to or failed to rebut Defendant's assertions.

Having carefully combed through Plaintiff's fact statements, exhibits, and response brief, one thing is clear: Plaintiff wishes to distance himself from several admissions that he made during his deposition. Plaintiff makes several self-serving arguments in his response to Defendant's fact statements and in his memorandum, including: his "deposition is not accurate;" it is "filled with half lie's and half truth's;" he "tried to get the errata sheet from defendant or reporter and got the run around;" and finally that his deposition was an opportunity for defendant to "twist and turn facts" and to "trick-fool-mislead this Court." Unfortunately for Plaintiff, the

admissions on record cannot simply be disregarded at summary judgment.

On April 24, 2013, pursuant to FRCP 30, Plaintiff gave his deposition before a certified shorthand reporter pursuant to notice. Plaintiff's deposition transcript was certified by the reporter. Plaintiff waived signature at the completion of the deposition as noted in the transcript. The Court's review of the transcript indicates that Plaintiff was not asked particularly hard or tricky questions. Rather, all questions pertained to the matters at issue in Plaintiff's case, where Plaintiff was duly sworn to testify the whole truth concerning the matters raised. The statements in Plaintiff's deposition constitute binding admissions under oath, and those admissions are inescapable. Thus, to the extent that statements in his response or memorandum directly contradict deposition testimony, the Court will not consider the later statements in ruling on the summary judgment motion. See *Buckner v. Sam's Club, Inc.,* 75 F.3d 290, 292 (7th Cir. 1996) ("As a general rule, the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony"); see also *Patterson v. Chicago Ass'n for Retarded Citizens,* 150 F.3d 719, 720 (7th Cir.1998). In short, the Court cannot accept self-serving arguments as a basis for denying a summary judgment motion, particularly where Plaintiff makes these statements and asks the Court to draw inferences without factual support from the record.

In sum, any statements or responses by either party that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, are irrelevant, or are not supported by evidence in the record will not be considered by the Court in ruling on Defendant's motion for summary judgment. Any paragraph or fact that is not supported by record evidence will be disregarded. And to the extent that arguments or facts raised by Plaintiff in his summary judgment briefing directly contradict his sworn deposition testimony, those too

will be disregarded.

  **C.**  **Factual Background**

  Defendant employed Plaintiff from May 1, 2003, to October 31, 2009, as a live-in janitor at Minnie Riperton Apartments (also known as Princeton Apartments), located at 4250 South Princeton in Chicago, Illinois. Princeton Apartments is senior public housing development owned by the Chicago Housing Authority ("CHA"). Between 2001 and May 2003, CHA appointed Donald Sutherland and Son ("DSSA") to manage the property. Effective May 1, 2003 through October 31, 2009, CHA appointed Defendant as the property manager, and effective November 1, 2009, CHA appointed Woodlawn Community Development Corp. ("WCDC") as the property manager.

  Plaintiff moved to Princeton Apartments on June 20, 2001, where he lived with his wife in an apartment. At the time that Plaintiff moved in at Princeton Apartments in June 2001, DSSA was the property manager for Princeton and DSSA employed Plaintiff full time as a "live-in janitor" at Princeton from 2001 through May 2003.

  Effective May 1, 2003, Defendant inherited DSSA employees, including Plaintiff. During his employment with Defendant, Plaintiff worked Monday through Friday, with Sundays and Saturdays off, however he was "on call" 24 hours a day. Plaintiff's title during his employment with Defendant was "live-in C Janitor." As a live-in C Janitor, Plaintiff worked at Princeton Apartments cleaning, sweeping, mopping and painting. As a live-in C janitor employed by Defendant, Plaintiff was a member of SEIU Local No. 1. At all times relevant to Plaintiff's Complaint, Defendant and SEIU Local No. 1 were parties to a Collective Bargaining Agreement ("CBA"), effective December 1, 2008 through November 30, 2011, an agreement to which Plaintiff was a covered member.

6

Defendant staffed employees at the Princeton Apartment property management office, including: Linda Bedar, Property Manager; Kenzella Greer, Oversight Manager; Marie Smith, Maintenance Supervisor; Keisha Walton, Leasing Manager; and Juana Pollard, Senior Oversight Manager (also known as Project Executive). Bedar became the property manager at Princeton Apartments in 2007. Bedar's job function was to oversee the operations of Princeton Apartments. Pollard's job function was to act as a liaison between Defendant and CHA, monitor Defendant's CHA portfolio, provide oversight to Defendant's employees assigned to CHA managed properties, and to ensure Defendant's compliance with the terms of the management agreements.

On September 9, 2009, Defendant was preparing Princeton for an upcoming walk through by a new property management company. As part of the preparations, Plaintiff was asked to paint the women's first floor restroom. As Plaintiff painted, a resident fainted and fell into him, causing Plaintiff to injure his right knee. On September 9, 2009, Plaintiff reported his injury to Bedar in the Princeton property management office, but he did not seek medical treatment at that time. In accordance with CHA's and Defendant's reporting protocol, Bedar reported Plaintiff's injury and related information on forms entitled "East Lake Management Incident Report Form," "CHA PMIP Program Liability Accident Report," and "Employee On The Job Injury Supervisor's Investigation Report." These forms were forwarded to CHA's third party claims administrator, CCMSI. During his deposition, Plaintiff acknowledged that CCMSI notified him in writing that it received his notice of injury and gave him an avenue for contacting CCMSI to discuss the claim.

On or about September 22, 2009, Juana Pollard held a meeting at Lincoln Perry Apartments (a CHA Property managed by Defendant) that Plaintiff and other Defendant-

7

employed SEIU Local No. 1 union members attended. During the 30-minute meeting, Pollard explained to the union members that Defendant anticipated losing management of certain CHA properties, but that Defendant desired to continue the employment of all employees assigned to those properties lost, and all employees who wanted to continue employment would be assigned to a different property in the same position. Pollard also discussed the possibility of layoffs for those who did not wish to remain employed with Defendant.

During the meeting, Pollard asked all SEIU Local No. 1 members, by a show of hands, to indicate if they did not want to continue employment with Defendant at a different property in the same position. Plaintiff rose his hand, indicating that, "he didn't want to go with East Lake" and did not "want to be another live-in janitor." Plaintiff asserted that being a "live-in was too much" because he had "no life" being "on call 24 hours a day" and that he did not want to work as a live-in C Janitor at any other Defendant-managed property. After the meeting, Plaintiff walked up to Pollard, shook her hand and told her, "it was a privilege working with you." Plaintiff asserted that he made this statement to Pollard because he "wasn't going to go anywhere with [Defendant] and do this again." Plaintiff asserted that because he raised his hand indicating that he did not want to continue employment with Defendant at another property in the same position, he knew that his employment with Defendant would end. During his conversation with Pollard on September 22, 2009, neither Plaintiff nor Pollard mentioned Plaintiff's September 9, 2009 injury, medical treatment, workers' compensation, or the Family Medical Leave Act ("FMLA"). Plaintiff did not see Pollard again.

When Plaintiff left the meeting and went outside, his supervisor, Marie Smith, asked him why he did not want to remain employed with Defendant at another property and he told her, "Who would?" Plaintiff also stated in his deposition that the property was not "somewhere * * *

[he wanted] to be working."

Between September 9, 2009 and October 8, 2009, Plaintiff continued to work. On September 24, 2009, Plaintiff complained to Bedar that his knee still hurt, and Bedar sent him to Mercy Works, Defendant's occupational medicine provider. On September 24, 2009, Mercy Works diagnosed Plaintiff with a right knee sprain and scheduled him for a follow-up appointment on October 8, 2009. On October 8, 2009, Plaintiff returned to Mercy Works for his follow-up appointment, at which time the treating physician removed Plaintiff from duty with a diagnosis of right knee sprain/medial meniscal tear and referred him for an MRI of the right knee. October 8, 2009 was Plaintiff's last date of employment with Defendant.

Defendant's contract with CHA to manage certain CHA properties, including Princeton Apartments, ended October 31, 2009. Pollard was the executive responsible for Defendant's CHA portfolio of managed properties, and Pollard monitored the CHA contracts under impending expiration, prepared layoff notices, and implemented the reassignment of over 200 Defendant employees who remained employed with Defendant through the transition. In accordance with the layoff provisions pursuant to Article V, Section 3 of the CBA between SEIU and Defendant, Defendant had to inform Plaintiff of his layoff fifteen (15) days before the effective date of the layoff. In response to his September 22, 2009 communication to Pollard that he did not wish to remain employed with Defendant as a result of the CHA property transition, Pollard drafted a layoff notice and sent it to Bedar at Princeton Apartments, to deliver to Plaintiff on October 12, 2009. On October 12, 2009, Bedar delivered the layoff notice to Plaintiff as Pollard instructed.

On October 12, 2009, Bedar and Keisha Walton, Leasing Manager at Princeton, went to Plaintiff's apartment, where he opened the door. Plaintiff claims that when Bedar and Walton

9

entered his apartment on October 12, 2009, Bedar yelled at his wife stating, "don't let them cut on your husband, talk to your husband * * * don't let them operate on [him]." Plaintiff also claims that Bedar brushed her leg against Plaintiff while he was standing at the door of his apartment. Plaintiff claims that Bedar's comments and actions were designed to coerce and intimidate Plaintiff into not filing a workers' compensation claim. Plaintiff also stated that Bedar said something to the effect of "fuck your workman's compensation * * * go get your unemployment" or "fuck your workman's compensation, we're laying you off."

During the October 12, 2009 visit, Bedar gave Plaintiff a document entitled, "NOTICE OF PROPOSED LAYOFFS," which explained the impending layoff, effective October 31, 2009. Plaintiff signed the notice. According to Plaintiff, he did not question the layoff, because his main concern was his injury, not the layoff. Furthermore, Plaintiff has previously told Pollard that he did not want a reassignment.

During his deposition, Plaintiff stated that between the September 9, 2009 injury and the October 12, 2009 delivery of the layoff notice, Plaintiff never mentioned anything to Bedar about wanting to file a workers' compensation claim. Plaintiff also never discussed FMLA leave with Bedar. Further, Plaintiff never contacted Defendant's corporate office nor any other manager or supervisor to inquire about or request FMLA leave stemming from his September 9, 2009 injury.

On or about October 12, 2009, Plaintiff contacted attorney Howard H. Ankin of Ankin Law Office, LLC., about filing a workers' compensation claim with the Illinois Workers' Compensation Commission. On October 13, 2009, Mr. Ankin drafted an application for benefits, and it was filed October 20, 2009. Plaintiff's workers' compensation claim, Case No. 09 WC 43373, settled pursuant to a Settlement Contract Lump Sum Petition and Order, entered April 22, 2010.

On October 31, 2009, Defendant's contract with CHA to manage Princeton expired. On November 3, 2009, while still a resident at Princeton Apartments, Plaintiff learned that WCDC was the new property manager at Princeton Apartments. Plaintiff moved out on November 6, 2009. Plaintiff never applied for employment with WCDC and when a WCDC representative offered Plaintiff the opportunity to remain a live-in janitor at Princeton under WCDC, Plaintiff told the representative that, "[he] didn't want to work for Woodlawn as another live-in janitor."

In a grievance filed with his union on November 12, 2009 and withdrawn on December 10, 2009, Plaintiff grieved that Defendant laid him off while he had a workers' compensation claim pending. During the administration of the grievance, Plaintiff admitted that he never told the union that he believed his layoff was retaliation for his work injury, but instead told them that he did "not want to go back to East Lake."

## II. Standard of Review

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual disputes that are irrelevant to the outcome of the suit "will not be counted." *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003) (quotation marks and citations omitted). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III. Analysis

### A. FMLA Claim

The FMLA contains two distinct types of provisions: "prescriptive" or "substantive" rights and "proscriptive" rights. The "prescriptive" or "substantive" rights include an employee's right to receive up to 12 weeks unpaid leave for a serious health condition and the right to reinstatement under the leave. The "proscriptive" rights include an employee's right not to be discriminated against or retaliated against for exercising FMLA rights. See 29 U.S.C. § 2615 (a)(2). Count III claims that Defendant violated Plaintiff's rights ("prescriptive" and "substantive") when it "unlawfully and willfully interfered with [his] rights under the FMLA by laying off the plaintiff as a pretext so as to prevent plaintiff from taking [FMLA] after which time the plaintiff would have been entitled to reinstatement in accordance with [FMLA]."

To prevail on a claim for FMLA interference, a Plaintiff must show that (1) he was eligible for the FMLA's protections; (2) the employer was covered by the FMLA; (3) he was

entitled to take leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; (5) his employer denied the FMLA benefits to which he was entitled. *Goelzer v. Sheyboygan County, Wisc.*, 604 F.3d 987, 993 (7th Cir. 2010).

Here, Plaintiff has completely failed to make the required showing. The record contains no evidence to support a contention that Defendant interfered with his FMLA rights or leave or denied a request for leave. In fact, Plaintiff admits that he never communicated to any member of Defendant's management, a supervisor, or the corporate office his request for leave under the FMLA or his intent to take FMLA leave. Plaintiff's FMLA claim is further undermined by his admission to Pollard on September 22, 2009, that he did not want to remain an employee of Defendant and knew that his employment with Defendant would end as a result of his decision. A claim for FMLA interference/entitlement cannot stand where it is undisputed that Plaintiff's employment termination would have occurred regardless of Plaintiff's request for or taking FMLA leave. See *Kohls v. Beverly Enter. Wisc., Inc.*, 259 F.3d 799, 804-09 (7th Cir. 2001); see also *Simpson v. Office of Chief Judge of Circuit Court of Will Co.*, 559 F.3d 706, 712-13 (7th Cir. 2009). Here, it is undisputed that Plaintiff's termination was self-inflicted and his layoff would have occurred regardless of any request for FMLA leave. Equally fatal to Plaintiff's claim is the fact that he never even requested FMLA leave (or indicated an intent to take leave). For these reasons, Plaintiff has failed to show any triable facts to support his FMLA claim, and Defendant is entitled to summary judgment on Count III of Plaintiff's fourth amended complaint.

### B. Retaliatory Discharge

Plaintiff also claims that he was laid off in retaliation for asserting a workers' compensation claim. To prevail in a cause of action for retaliatory discharge under Illinois common law, a plaintiff must establish that (1) he exercised a statutory or constitutional right; (2)

he was discharged in retaliation for his activity; and (3) the defendant's conduct was motivated by unlawful considerations (*i.e.*, in contravention of a clearly mandated public policy). *Gomez v. Finishing Co.*, 369 Ill. App. 3d 711, 718 (1st Dist. 2006); see also *Blount v. Stroud*, 232 Ill. 2d 302, 309 (2009). If the plaintiff succeeds in proving a *prima facie* case, "the burden of proof shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Gomez*, 369 Ill. App. 3d at 719. The plaintiff then has the opportunity to prove that the reasons offered by the defendant were not true but merely a pretext for discrimination, by showing either that the explanation is not believable or raises a genuine issue of fact as to whether the defendant discriminated against the plaintiff. *Id.*

Defendant does not dispute that Plaintiff can satisfy the first prong of a *prima facie* case for retaliatory discharge. Defendant employed Plaintiff at the time of his September 9, 2009 injury. Defendant subsequently issued Plaintiff a layoff notice on October 12, 2009. Also on October 12, 2009, Plaintiff exercised his rights granted by the Illinois Workers' Compensation Act ("IWCA") when he hired an attorney and filed a claim with the Commission on Oct. 20, 2009. Then, as previously set forth in detail, during a meeting on September 22, 2009, Juana Pollard asked Plaintiff if he wanted to remain an employee in the face of changes occurring with CHA properties. During and after this meeting (well before Plaintiff exercised his rights under the IWCA), Plaintiff expressly declined Defendant's offer to continue employment with Defendant in a reassignment.

At his deposition, Plaintiff made it abundantly clear that he purposefully choose not to continue his employment. In Plaintiff's words, he did not "want to be another live-in janitor" because being a "live-in was too much", he had "no life", and "was on call 24 hours a day." This evidence, standing alone, is fatal to Plaintiff's claim that Defendant was motivated to lay him off

in retaliation for filing a workers' compensation claim. Rather, Defendant merely carried out Plaintiff's expressed desire to be released from his employment.

Likewise, Plaintiff's admissions in his answers to Defendant's request for admissions are consistent with his deposition testimony. Plaintiff admitted to attending the September 22 meeting and being informed that Defendant intended to retain and reassign all affected employees to work at different properties, effective November 1, 2009. In his answers to Defendant's requests, Plaintiff specifically stated: "I told Juana Pollard I did'nt [sic] want to work for Eastlake/ I did not want to be a c Janitor live in Janitor for no one ever again." Thus, Plaintiff's lay off was at his own choosing and he has failed to demonstrate that he was discharged in retaliation for protected activity or that Defendant's conduct was motivated by unlawful considerations.

Plaintiff's primary contention appears to be that when Bedar visited his apartment on October 12, 2009 to deliver his layoff notice, she engaged in conduct that implied retaliatory animus. Namely, Plaintiff highlights Bedar's statements to Plaintiff's wife, Bedar brushing Plaintiff's leg and Bedar's statement of "fuck your workman's compensation * * * go get your unemployment * * * we're laying you off." But Plaintiff did not even file his workers' compensation claim until October 20, 2009, after the layoff notice was served. Moreover, Plaintiff testified in his deposition that neither Bedar nor Pollard were aware of his intent to file a workers' compensation claim and that he never mentioned to them his intent to file a workers' compensation claim at any time from the date of his injury through the effective date of his layoff.

Finally, it is "essential" to a plaintiff's retaliatory discharge claim that he show that those responsible for the termination were aware of the workers' compensation claim. See *Marin v.*

15

*American Meat Packing Co.*, 204 Ill. App. 3d 302, 308 (1st Dist. 1990). Here, even if Plaintiff did discuss an IWCA claim with Bedar on October 12, 2009 (a contention that is not supported by the record), Pollard, not Bedar, drafted the notice and directed the layoff notice to Plaintiff. Plaintiff admits that Pollard never mentioned his injury or his workers' compensation claim and that he never discussed it with her. Therefore, Plaintiff cannot show that Pollard had a retaliatory animus in laying him off. Absent the animus, Plaintiff's clear and unequivocal communication to Pollard at the September 22, 2009 union meeting—that he did not want to continue employment with Defendant at another managed property in the same position—dooms his retaliation claim.

### IV. Conclusion

For these reasons, the Court grants Defendant's motion for summary judgment [87]. Judgment will be entered in favor of Defendant and against Plaintiff James Butler on all claims.

Dated: January 24, 2014

                                                          Robert M. Dow, Jr.
                                                          United States District Judge